## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| JESSE GUZMAN, ULTIMATE CONCRETE, LLC, and INTERCOASTAL FINANCE LTD., | Civil No. 24-1467 |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| HAMILTON RESERVE BANK LTD. and ACELERA INTERNATIONAL CUSTODIAL BANK, LLC f/k/a HAMILTON INTERNATIONAL RESERVE BANK, LLC | |
| Defendants. | |

TO THE HONORABLE COURT:

Plaintiffs, Jesse Guzman, Ultimate Concrete, LLC, and Intercoastal Finance Ltd. (collectively, "Plaintiffs"), through their undersigned counsel, bring this complaint against Defendants Hamilton Reserve Bank Ltd., and Acelera International Custodial Bank, LLC, formerly known as Hamilton International Reserve Bank, LLC (collectively, "Defendants"), and allege as follows:

### NATURE OF THE ACTIONS

This is an action to recover millions of dollars in Plaintiffs' bank deposits that Defendants are illegally refusing to return. Plaintiffs bring claims for breach of contract, conversion, fraud, and unjust enrichment; claims for false representation and illegally withholding money in violation of 23 L.P.R.A. § 1014 and 19 L.P.R.A. §§ 865, 952; claims for breach of warranty, misleading advertising, deceptive conduct, and false representations in violation of the Consumer Affairs Act

1

of St. Kitts and Nevis (CAP 18.38 §§§ 10, 35, 36); claims for false representations, unconscionable conduct, and illegally withholding money in violation of Tex. Bus. & Com. Code §§ 4.215, 4.402, and 17.50(a)(1),(3); and claims for unfair and deceptive trade practices in violation of N.M.S.A § 57-12-3.  All of Plaintiffs' claims arise from Defendants' illegal withholding of and refusal to return Plaintiffs' money.

## THE PARTIES

1.      Jesse Guzman is an individual domiciled in Columbus, New Mexico. Mr. Guzman is the is the sole manager, 100% owner, and president of Ultimate Concrete, LLC.

2.      Ultimate Concrete, LLC, is a Texas limited liability company with its principal place of business in Texas. It is therefore domiciled in Texas, although it has operations in New Mexico, Arizona, and other states in the United States as well.

3.      Intercoastal Finance Ltd. is a company organized in Belize. Intercoastal Finance Ltd. is 100% owned by Jesse Guzman, and Mr. Guzman is the sole director and officer of Intercoastal Finance Ltd.

4.      Acelera International Custodial Bank, LLC, ("Acelera Bank") formerly known as Hamilton International Reserve Bank, LLC, is an international banking entity organized under the laws of Puerto Rico, with its principal place of business in San Juan, Puerto Rico at 450 Ave. de la Constitución, Suite 200 San Juan 00901 Puerto Rico.

5.      Hamilton Reserve Bank Ltd., ("HRB") a bank organized under the laws of St. Kitts and Nevis where it has its principal place of business and is therefore domiciled in St. Kits and Neviss. Acelera Bank is affiliated with Hamilton Reserve Bank Ltd., and upon information and

belief, Acelera Bank operates jointly with HRB, and thus Acelera Bank and HRB will be referred to herein jointly as "Defendants."

## JURISDICTION AND VENUE

6.      The case is based on the parties' diversity of citizenship under 28 U.S.C. § 1332(a)(3) because Mr. Guzman, Ultimate Concrete, and Acelera Bank are citizens of different states and territories within the United States, and Intercoastal Finance Ltd. and HRB are citizens of foreign states, and the matter in controversy, $50 million that Defendants wrongfully and illegally refuse to return,  exceeds the sum or value of $75,000, exclusive of interest and costs.

7.      HRB through itself and its affiliate Acelera Bank has purposefully availed itself of the benefits and protections of Puerto Rico and is therefore subject to its jurisdiction.

8.      Venue is proper in this district as a substantial portion of the Defendants' actions that Plaintiffs complain of occurred within this district.

## FACTUAL BACKGROUND

### Defendant Induces Plaintiffs to Deposit Funds in its Bank

9.      Defendants state on their website that it "is the largest global bank in the entire region and the hometown bank of America's founding father Alexander Hamilton."[1]  The website further states that "it serv[es] a large and rapidly expanding clientele of local and global residents from 150 countries," maintains "a fortress balance sheet, a large asset base, a pristine BSA/AML compliance history," and offers "24/7 [*Temenos*] digital banking, the #1 banking system that runs 80% of the world's largest banks." Defendants further claim that they have worldwide offices and

---

[1] Available at *https://hrbank.com/*, accessed on September 3, 2024.

affiliates and that they are the largest escrow agent in St. Kitts and Nevis. They also state that they provide "Bank Trust and Escrow Services" and "Business Banking." Defendants certify the "Ultra Safety of Customer Deposits," and represent to their clients that customer deposits remain in ***cash and sovereign bonds***.

10.    Ultimate Concrete, LLC is a supplier of concrete operating in several states throughout the United States. It has derived a substantial amount of its revenue from government contracting work. Intercoastal Finance Ltd. is affiliated with Ultimate Concrete through their shared ownership by Mr. Guzman.

11.    Based on representations made by Defendants, in December 2021, Plaintiffs were induced to transfer approximately $50 million from Ultimate Concrete, LLC's Bank of America account in El Paso County, Texas to HRB.

12.    HRB subsequently wired the money back, and instructed Plaintiffs to wire the money instead to HRB's affiliate, Acelera Bank (then known as Hamilton International Reserve Bank, LLC, which was formerly known as State Trust International Bank & Trust) in San Juan, Puerto Rico. Plaintiffs wired approximately $50 million to Acelera Bank pursuant to these instructions.

13.    The wiring instructions provided by Defendants stated that Acelera Bank was fully licensed in the U.S. and is under "Common Ownership" with HRB. The wiring instructions reference Acelera Bank as "our U.S. bank" which transacts directly with the U.S. Federal Reserve.

14.    On information and belief, Acelera Bank subsequently wired the funds to its affiliate in St. Kitts and Nevis, HRB.

15.     Before Plaintiffs deposited money with Defendants, on September 15th, 2021, Intercoastal Finance Ltd. and HRB entered into a "HAMILTON RESERVE BANK LTD. CUSTOMER ACCOUNT AGREEMENT" (herein after referred to as the "Agreement").

16.     The Agreement provided that "Assets from your Account generally may be withdrawn three business days after they have cleared in your Account…you may make withdrawals from your Account up to the amount of the Available Balance….the Bank will endeavor to make your assets available to you as promptly as possible within its discretion."

**Plaintiffs' Funds Were Used to Purchase Now Defaulted Sri Lankan Bonds**

17.     Not coincidentally, around the same time that Plaintiffs transferred the funds to Defendants, Defendants purportedly acquired a beneficial interest in approximately $250,000,000.00 in bonds issued by the government of Sri Lanka (the "Bonds"). Upon information and belief and unbeknownst to Plaintiffs, Defendants misappropriated Plaintiffs' deposit to purchase its purported beneficial interest in the Bonds.

18.     Defendants' purchase of the Bonds was a poor investment decision. The Bonds were to mature on July 25, 2022, but on April 12, 2022, Sri Lanka declared a moratorium on payments on its external debt, including the Bonds. On June 21, 2022, HRB commenced an action in the United States District Court for the Southern District of New York in an attempt to enforce the rights accruing to its purported beneficial interest in the Bonds. That action is currently stayed pending the Sri Lankan government's negotiations with the International Monetary Fund.

19.     It did not take long for Sri Lanka's default on the Bonds—purchased with the funds deposited with Defendants by its customers—to become a problem for those very same customers.

5

**Plaintiffs Begin Requesting the Withdrawal of their Own Funds and Defendants Make them Jump Through Hoops**

20.     In May 2022, Plaintiffs decided to withdraw $27,000,000 of the funds deposited with Defendants.[2] The request was made through Defendants' account manager, Oksana Williams. However, rather than return the Plaintiffs' money, Defendants instead commenced a strategy of obfuscation, concealment, and delay, all a pretext to cover up the theft of Plaintiffs' funds.

21.     On May 9, 2022, Plaintiffs contacted Ms. Williams by email to request the procedure for a wire transfer from Defendants.  Ms. Williams responded on May 13, 2022, with a Wire Transfer Request Form and Customer Packet, which she instructed Plaintiffs to fill out. After Plaintiffs did so, Ms. Williams requested the amount of the wire transfer. On May 24, 2022, Plaintiffs sent Oksana Williams forms for a wire transfer, requesting the withdrawal of $27 million.

22.     On May 31, 2022, Ms. Williams emailed Plaintiffs, refusing to return their money:

> Jesse is requesting to send out over $27 million, by [HRB's] standards [HRB] ha[s] never moved this amount much in one transfer. It is also very suspicious and is a delicate matter.  I [Oksana Williams of HRB] would suggest sending a smaller amount at a time.  If Jesse still wants the full amount to go out, [HRB] will have to wait for approval from Compliance. When I [Oksana Williams of HRB] do, I will notify you.

23.     Attempting to resolve the issue, Plaintiffs did as Ms. Williams suggested and requested a "test wire" of $200,000. On June 2, 2022, Defendants wired $200,000 to Plaintiffs. Given the success of the "test wire," on June 24, 2022, Plaintiffs again requested that $27 million be wired from the Defendants' account. However, this time Defendants refused to wire the money.

---

[2] By letter dated July 28, 2022, Defendants confirmed an account balance of $50,246,815.00 in the name of Intercoastal Finance Ltd.

24.    What followed was a Kafka-esque nightmare. Defendants repeatedly made inane requests for documents and information, supposedly to satisfy unspecified "compliance" issues. Plaintiffs, in turn, repeatedly supplied the requested documents and information, only to be faced with brand new requests for documents, or even asked for the same very same documents already provided.  This happened time and again, for months.

25.    Plaintiffs provided documents and information in response to Defendants' requests on August 15, 2022, September 26, 2022, November 14, 2022, December 2, 2022, December 7, 2022, January 10, 2023, February 8, 2023, June 6, 2023, June 21, 2023, June 27, 2023, and July 3, 2023. In each instance, after Plaintiffs provided precisely the documents and information requested, Defendants would respond by: 1) claiming that the documents were not received; 2) claiming that the documents needed to be sent to a different department within Defendants' organization; 3) claiming that the documents needed to be provided via a different method (*e.g.*, a "Customer Service Portal" rather than email); 4) claiming that a new, different set of documents was needed; and—after those excuses wore thin—5) requesting the *exact same documents* all over again.

26.    For example, on February 20, 2023, the HRB "Operations Department" responded to the latest set of documents uploaded by Plaintiffs by claiming (falsely) that they were not responsive and asserting that the "Ultimate Beneficial Owner" of the account (which is Mr. Guzman) could not be verified. This, despite the fact that Plaintiffs uploaded precisely the documentation Defendants requested.

27.    One frequently-used strategy by Defendants was to insist that documents could only be processed if uploaded via a "Customer Service Portal," and then, after Plaintiffs uploaded the documents as requested, insist the documents were never received.

28.    For example, on June 21, 2023, after Plaintiffs provided documents in response to Defendants' latest request, the Operations Department claimed it still needed the following: (i) Customer Certification; (ii) two proofs of physical address, such as a utility bill and bank statement; and (iii) monthly payroll record for Ultimate Concrete, LLC.

29.    Plaintiffs provided a screenshot of the computer screen used to upload the documents demonstrating that the requested documents were uploaded on June 21, 2023, via the Customer Service Portal. The upload was confirmed by an individual at the email address "smoses@hrbank.com." Nevertheless, on June 23, 2023, an individual using the same address requested that the June 21, 2023 correspondence be sent to the Operations Department, despite the fact that the June 21, 2023, correspondence was sent to the Operations Department in the first instance.

30.    On June 27, 2023, the Operations Department itself emailed claiming that it had not received the requested documentation, but that all it needed uploaded in order to honor Plaintiffs' wire request were the following documents: (i) the one page duly certified "Customer Certification" dated February 20, 2023 and (ii) three forms of proof of physical address for Ultimate Concrete, LLC. Plaintiffs responded with a screenshot of a computer screen showing the documents were uploaded via the Customer Service Portal, along with a reference ID.

31.    Despite this offer of proof, the Operations Department continued to insist that the documents had not been uploaded on the Customer Service Portal. Accordingly, on July 3, 2023,

Plaintiffs uploaded the same documents on the portal again, and copied smoses@hrbank.com. Nonetheless, two days later, the Operations Department claimed again that the documents were not uploaded.

32.     It is clear that Defendants either 1) lied that the documents had not been uploaded to their Customer Service Portal or 2) deliberately insisted on the use of a defective system as an excuse to avoid addressing Plaintiffs' request.

33.     On numerous occasions, Plaintiffs formally requested a meeting with Defendants' officers, including the CEO, CFO, CLO, and the account manager (Oksana Williams), in an attempt to resolve the supposed issues with their withdrawal. Defendants failed to respond to any of these requests. Making matters even more difficult, Defendants also refused to communicate with attorneys retained by Plaintiffs.

34.     The explanation for this behavior is simple: Defendants manufactured the purported compliance issues in order to steal Plaintiffs' funds.

**Plaintiffs Take Legal Acton Against Defendants for Return of their Funds**

35.     On October 3, 2023, Plaintiff Jesse Guzman filed a sworn Statement of Complaint with the Royal St. Christopher and Nevis Police in the White Collar Crime Unit regarding HRB and its refusal to return funds to Plaintiffs. As of yet, Plaintiffs have received no relief.

36.     The Customer Account Agreement entered into between Intercoastal Finance Ltd. and HRB provides that disputes between the parties must first be mediated by a mediator chosen by HRB. Accordingly, on July 16, 2024, Intercoastal Finance, through counsel, formally requested mediation with HRB and that HRB appoint a mediator. Defendants failed to respond to that letter.

37.    On August 26, 2024, Intercoastal Finance sent a further letter through counsel reiterating its request for mediation and that HRB appoint a mediator.

38.    On September 2, 2024, HRB's Operations Department finally contacted Intercoastal Finance. Continuing their pattern of deceptive conduct, Defendants acknowledged receipt of the August 26, 2024 letter, but purported to be "confused" by the letter, suggested it must have been sent "by mistake," and insisted that it could not communicate with Intercoastal Finance's counsel unless it "upload[ed] a notarized letter of authorization through the Bank's secure customer login portal."

39.    In fact, as Defendants well knew, such a notarized letter had been both uploaded to the Customer Service Portal and separately attached to the letter. Defendants' email response was one more instance of their fraudulent modus operandi—insist that no action could be taken without certain documentation, and then refuse to accept or acknowledge receipt of that documentation when it was provided.  HRB continues to refuse to appoint a mediator and refuses to engage in any mediation discussions.  Any and all conditions precedent to filing suit have been performed and/or have occurred.

40.    As of the date of filing this complaint, Defendants have refused Plaintiffs' demand for return of their funds.

## FIRST CAUSE OF ACTION

### Breach of Contract (by Intercoastal Finance Ltd. against HRB)

41.    Plaintiffs reincorporate and reallege the allegations in paragraphs 1-40 above, as if fully set forth herein.

42.     When Plaintiffs deposited money with Defendants, Intercoastal Finance Ltd. and HRB entered into a "HAMILTON RESERVE BANK LTD. CUSTOMER ACCOUNT AGREEMENT" (herein after referred to as the "Agreement") on September 15th, 2021.

43.     The Agreement provided that "Assets from your Account generally may be withdrawn three business days after they have cleared in your Account… you may make withdrawals from your Account up to the amount of the Available Balance….the Bank will endeavor to make your assets available to you as promptly as possible within its discretion."

44.     Despite the above contractual provision, Defendants, including HRB, have refused Intercoastal Finance Ltd.'s requests for the withdrawal of funds in excess of $50 million. By failing to return the funds, HRB has breached its contract with Intercoastal Finance Ltd.

45.     As a result of HRB's breach of contract, Intercoastal Finance Ltd. has suffered actual damages of not less than $50,246,815.00, plus interest.

<u>**SECOND CAUSE OF ACTION**</u>

**Conversion (by all Plaintiffs against all Defendants)**

46.     Plaintiffs reincorporate and reallege the allegations in paragraphs 1-40 above, as if fully set forth herein.

47.     Plaintiffs have possessory rights and interests in the approximately $50,000,000.00 plus accrued interest they wired into Acelera Bank. Defendants have refused to return Plaintiffs' funds despite numerous requests to do so. Thus, Defendants have interfered with Plaintiffs' ownership of the funds by Defendants' failure to return those funds.

48.     As a result of Defendants' conversion, Plaintiffs have suffered actual damages of not less than $50,246,815.00, plus interest.

## THIRD CAUSE OF ACTION

### Fraud - Deposit of Funds (by all Plaintiffs against all Defendants)

49.    Plaintiffs reincorporate and reallege the allegations in paragraphs 1-40 above, as if fully set forth herein.

50.    Defendants represented to Plaintiffs that funds deposited with them would be secure and earn interest, and that Plaintiffs would be able to withdrawal their funds. Based on those representations, Plaintiffs wired approximately $50,000,000.00 to Defendants.

51.    Instead of securing and protecting Plaintiffs' interest, Defendants used Plaintiffs' money to make high risk and speculative investments, such as Defendants' purchase of the Bonds, and instead of allowing Plaintiffs to withdraw their funds, Defendants have refused the return of those funds.

52.    As a result of Defendants' fraud, Plaintiffs have suffered actual damages of not less than $50,246,815.00, plus interest.

## FOURTH CAUSE OF ACTION

### Fraud - Retention of Funds (by all Plaintiffs against all Defendants)

53.    Plaintiffs reincorporate and reallege the allegations in paragraphs 1-40 above, as if fully set forth herein.

54.    Defendants represented to Plaintiffs that Plaintiffs' money would be returned to them upon completing identity verification procedures and providing requested documentation. Defendants made these requests knowing they would not return Plaintiffs' funds even when Plaintiffs complied with said requests. Upon Plaintiffs' repeated compliance with Defendants' requests, Defendant in fact failed to return Plaintiffs' funds.

12

55.     As a result of Defendants' fraud, Plaintiffs have suffered actual damages of not less than $50,246,815.00, plus interest.

### FIFTH CAUSE OF ACTION

**Unjust Enrichment (by all Plaintiffs against all Defendants)**

56.     Plaintiffs reincorporate and reallege the allegations in paragraphs 1-40 above, as if fully set forth herein.

57.     Defendants received substantial benefits from the Plaintiffs by retaining and having use of the approximately $50,000,000 of Plaintiffs' funds deposited with Defendants.

58.     Those benefits were received at the expense of, and ultimate detriment to, the Plaintiffs.

59.     Because Defendants represented to Plaintiffs that their funds would be "secure" and freely accessible, and Defendants have instead retained them without legitimate basis, equity and good conscience would not allow Defendants to retain those benefits.

### SIXTH CAUSE OF ACTION

**Violation of 23 L.P.R.A. § 1014 (by all Plaintiffs against all Defendants)**

60.     Plaintiffs reincorporate and reallege the allegations in paragraphs 1-40 above, as if fully set forth herein.

61.     Puerto Rican law prohibits acts and advertisements that constitute or tend to constitute "fraud or deceit, where the...service is falsely represented or which creates in the consumer an image or erroneous impression on the....quality, grade, health or any other characteristics of the...service." 23 L.P.R.A § 1014.

13

62.    Acelera Bank has its principal place of business in Puerto Rico. HRB is affiliated with Acelera Bank and, on information and belief, operates jointly with it. As outlined above, Defendants advertised the "Ultra Safety of Customer Deposits" and represented to their clients that customer deposits remain in cash and sovereign bonds. On its website hrbank.com, Defendants advertise that its bank "offers fast, safe…secure" "hassle-free" banking and boasts its "capital strength." These advertisements are false representations of the banking services Defendants offer because Defendants' banking services are anything but safe, fast, or "hassle-free." These representations gave Plaintiffs the erroneous impression that the bank was a safe place to put their money. Based on this erroneous impression, Plaintiffs deposited approximately $50 million with Defendants. Instead of the bank being a safe place for consumer deposits, Defendants bought risky foreign bonds with Plaintiffs' money and have refused to return their funds for over two years.

63.    As a result of Defendants' false representations, Plaintiffs have suffered actual damages of not less than $50,246,815.00, plus interest.

## SEVENTH CAUSE OF ACTION

### Violation of 19 L.P.R.A. § 865 (by all Plaintiffs against all Defendants)

64.    Plaintiffs reincorporate and reallege the allegations in paragraphs 1-40 above, as if fully set forth herein.

65.    Puerto Rican law mandates that **"**a deposit of money [in a bank] becomes available for withdrawal as of right at the opening of the bank's next banking day after receipt of the deposit." 19 L.P.R.A § 865.

66.    Acelera Bank has its principal place of business in Puerto Rico. HRB is affiliated with Acelera Bank and, on information and belief, operates jointly with it.

14

67.     Plaintiffs deposited approximately $50 million with Defendants in December 2021. Plaintiffs began requesting the withdrawal and return of their money in May 2022. Despite Plaintiffs' right to withdraw their funds, Defendants have refused to allow Plaintiffs access to their own money.

68.     Defendants' refusal has been made in bad faith.

69.     As a result of Defendants' failure to make available Plaintiffs' funds for withdrawal, Plaintiffs have suffered actual damages of not less than $50,246,815.00, plus interest.

## EIGHTH CAUSE OF ACTION

### Violation of 19 L.P.R.A. § 952 (by all Plaintiffs against all Defendants)

70.     Plaintiffs reincorporate and reallege the allegations in paragraphs 1-40 above, as if fully set forth herein.

71.     Puerto Rican law provides that "a payor bank wrongfully dishonors an item if it dishonors an item that is properly payable," and, further, that "a payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item." 19 L.P.R.A § 952.

72.     Acelera Bank has its principal place of business in Puerto Rico. HRB is affiliated with Acelera Bank and, on information and belief, operates jointly with it.

73.     Plaintiffs deposited approximately $50 million with Defendants in December 2021. Plaintiffs began requesting the withdrawal and return of their money in May 2022. Despite Plaintiffs' right to withdraw their funds, Defendants have refused to allow Plaintiffs access to their own money.

74.     Defendants' refusal has been made in bad faith.

75.    As a result of Defendants' failure to make available Plaintiffs' funds for withdrawal, Plaintiffs have suffered actual damages of not less than $50,246,815.00, plus interest.

## NINTH CAUSE OF ACTION

### Violation of CAP 18.38 § 10 (by all Plaintiffs against all Defendants)

76.    Plaintiffs reincorporate and reallege the allegations in paragraphs 1-40 above, as if fully set forth herein.

77.    Nevis law requires that "[i]n a contract for the supply or provision of services to a consumer there shall be an implied warranty that the services shall be rendered with due care and skill." The Consumer Affairs Act of St. Kitts and Nevis (CAP 18.38 § 10) provides that when a service does not comply with this warranty, and the supplier of the service fails to remedy the failure within a reasonable time, the consumer is entitled to recover the costs of remedying this failure; cancel the contract; and obtain damages and compensation, including for distress, inconvenience, and vexation. CAP 18.38 § 20.

78.    HRB has its principal place of business in St. Kitts and Nevis. Acelera Bank is affiliated with HRB and, on information and belief, operates jointly with it.

79.    Defendants had a duty to exercise due care with respect to Plaintiffs' funds deposited in its bank. Further, by warranting that their bank is safe and secure, Defendants expressly assumed a duty to keep Plaintiffs' deposits safe and secure.

80.    Defendants breached this duty by using the entirety of Plaintiffs' deposit to buy risky Sri Lankan bonds. Defendants did not keep Plaintiffs' deposit safe or secure, thus failing to exercise due care and skill.

16

81.     Defendants' purchase of the bonds, which to this date it has not recovered its money from, has directly resulted in its inability to return the deposits of its clients, including Plaintiffs. As a result of Defendants' reckless investment decisions, Plaintiffs have suffered actual damages of not less than $50,246,815.00, plus interest.

### TENTH CAUSE OF ACTION

### Violation of CAP 18.38 § 35 (by all Plaintiffs against all Defendants)

82.     Plaintiffs reincorporate and reallege the allegations in paragraphs 1-40 above, as if fully set forth herein.

83.     Nevis law prohibits misleading or deceptive conduct or conduct that is "likely to mislead or deceive" in connection with the supply or promotion of services. CAP 18.38 § 35. Nevis law provides that "a person who suffers loss as a result of the conduct may seek redress from court in form of damages." *Id.*

84.     HRB has its principal place of business in St. Kitts and Nevis. Acelera Bank is affiliated with HRB and, on information and belief, operates jointly with it.

85.     As outlined in paragraph 9 above, Defendants advertised the "Ultra Safety of Customer Deposits" and represented to its clients that customer deposits remain in cash and sovereign bonds. On its website hrbank.com, Defendants advertise that their bank "offers fast, safe…secure" "hassle-free" banking and boasts its "capital strength." These advertisements are false representations of the banking services Defendants offer because Defendants' banking services are anything but safe, fast, or "hassle-free." These representations gave Plaintiffs the erroneous impression that the bank was a safe place to put their money. Based on this erroneous impression, Plaintiffs deposited approximately $50 million with Defendants. Instead of the bank

being a safe place for consumer deposits, Defendants bought risky foreign bonds with Plaintiffs' money and have refused to return their funds for over two years.

86.     As a result of Defendants' misleading and deceptive conduct, Plaintiffs have suffered actual damages of not less than $50,246,815.00, plus interest.

**ELEVENTH CAUSE OF ACTION**

**Violation of CAP 18.38 § 36 (by all Plaintiffs against all Defendants)**

87.     Plaintiffs reincorporate and reallege the allegations in paragraphs 1-40 above, as if fully set forth herein.

88.     Nevis law provides that a supplier of services shall not "falsely represent that the—services are of a particular standard, quality, value or grade; or … represent that goods or services have …characteristics…or benefits they do not have…[or] make false or misleading representation or statements concerning the existence, exclusion or effect of any warranty, guarantee, right, or remedy." CAP 18.38 § 36.

89.     HRB has its principal place of business in St. Kitts and Nevis. Acelera Bank is affiliated with HRB and, on information and belief, operates jointly with it.

90.     As outlined in paragraph 9 above, Defendants advertised the "Ultra Safety of Customer Deposits" and represented to its clients that customer deposits remain in cash and sovereign bonds. On its website hrbank.com, Defendants advertise that their bank "offers fast, safe…secure" "hassle-free" banking and boasts its "capital strength." These advertisements are false representations of the banking services Defendants offer because Defendants' banking services are anything but safe, fast, or "hassle-free." These representations gave Plaintiffs the erroneous impression that the bank was a safe place to put their money. Based on this erroneous

impression, Plaintiffs deposited approximately $50 million with Defendants. Instead of the bank being a safe place for consumer deposits, Defendants bought risky foreign bonds with Plaintiffs' money and have refused to return their funds for over two years.

91.    Defendants represented to Plaintiffs that Plaintiffs' money would be returned to them upon completing identity verification procedures and providing documentation. Defendants made these requests knowing they would not return Plaintiffs' funds even when Plaintiffs complied with said requests. Upon Plaintiffs' repeated compliance with Defendants' requests, Defendants in fact failed to return Plaintiffs' funds.

92.    As a result of Defendants' false and misleading representations, Plaintiffs have suffered actual damages of not less than $50,246,815.00 plus interest.

## TWELFTH CAUSE OF ACTION

**Violation of Tex. Bus. & Com. Code § 17.50(a)(1) (by all Plaintiffs against all Defendants)**

93.    Plaintiffs reincorporate and reallege the allegations in paragraphs 1-40 above, as if fully set forth herein.

94.    Texas law expressly prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," which includes, but is not limited to, "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," Tex. Bus. & Com. Code § 17.46(b)(7), and provides Plaintiffs a right of action under Tex. Bus. & Com. Code § 17.50(a)(1).

95.    As outlined in paragraph 9 above, Defendants advertised the "Ultra Safety of Customer Deposits" and represented to its clients that customer deposits remain in cash and sovereign bonds. On its website hrbank.com, Defendants advertise that their bank "offers fast,

19

safe…secure" "hassle-free" banking and boasts its "capital strength." These advertisements are false representations of the banking services Defendants offer because Defendants' banking services are anything but safe, fast, or "hassle-free." These representations were made to Plaintiffs in Texas and/or New Mexico and gave Plaintiffs the erroneous impression that the bank was a safe place to put their money. Based on this erroneous impression, Plaintiffs transferred approximately $50 million from Texas to Defendants. Instead of the bank being a safe place for consumer deposits, Defendants bought risky foreign bonds with Plaintiffs' money and have refused to return their funds for over two years.

96.     Defendants knowingly and willfully engaged in the aforementioned deceptive trade practice.

97.     As a result of Defendants' false and misleading representations, Plaintiffs have suffered actual damages of not less than $50,246,815.00, plus interest, and are further entitled to trebling of those damages.

## THIRTEENTH CAUSE OF ACTION

**Violation Tex. Bus. & Com. Code § 17.50(a)(3) (by all Plaintiffs against all Defendants)**

98.     Plaintiffs reincorporate and reallege the allegations in paragraphs 1-40 above, as if fully set forth herein.

99.     Texas law also provides Plaintiffs a cause of action under § 17.50(a)(3) for "any unconscionable action or course of action by any person."

100.    Defendants represented to Plaintiffs in Texas and/or New Mexico that Plaintiffs' money would be returned to them upon completing identity verification procedures and providing documentation. Defendants made these requests knowing they would not return Plaintiffs' funds

even when Plaintiff complied with said requests. Upon Plaintiffs' repeated compliance with Defendants' requests, Defendants in fact failed to return Plaintiffs' funds.

101.    When Intercoastal Finance requested mediation pursuant to Defendants' own policies, Defendants failed to respond to Intercoastal Finance's requests and effectively blocked mediation.

102.    Defendants have effectively stolen Plaintiffs' $50 million and put them through a two-years-long series of documentation requests for the purpose of concealing the fact that they do not have Plaintiffs' funds and never planned on returning Plaintiffs' funds.

103.    Defendants knowingly and willfully engaged in the aforementioned deceptive trade practice.

104.    As a result of Defendants' false and misleading representations, Plaintiffs have suffered actual damages of not less than $50,246,815.00, plus interest, and are further entitled to trebling of those damages.

## FOURTEENTH CAUSE OF ACTION

### Violation of Tex. Bus. & Com. Code § 4.215 (by all Plaintiffs against all Defendants)

105.    Plaintiffs reincorporate and reallege the allegations in paragraphs 1-40 above, as if fully set forth herein.

106.    Texas law mandates that "a deposit of money [in a bank] becomes available for withdrawal as of right at the opening of the bank's next banking day after receipt of the deposit." Tex. Bus. & Com. Code § 4.215.

107.    Plaintiffs transferred approximately $50 million from their account in Texas to Defendants in December 2021. Plaintiffs began requesting the withdrawal and return of their

money in May 2022. Despite Plaintiffs' right to withdraw their funds, Defendants have refused to allow Plaintiffs access to their own money.

108.    Defendants' refusal has been made in bad faith.

109.    As a result of Defendants' failure to make available Plaintiffs' funds for withdrawal, Plaintiffs have suffered actual damages of not less than $50,246,815.00, plus interest.

## FIFTEENTH CAUSE OF ACTION

### Violation of Tex. Bus. & Com. Code § 4.402 (by all Plaintiffs against all Defendants)

110.    Plaintiffs reincorporate and reallege the allegations in paragraphs 1-40 above, as if fully set forth herein.

111.    Texas law provides that **"**a payor bank wrongfully dishonors an item if it dishonors an item that is properly payable," and, further, that "a payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item." Tex. Bus. & Com. Code § 4.402.

112.    Plaintiffs transferred approximately $50 million from their account in Texas to Defendants in December 2021. Plaintiffs began requesting the withdrawal and return of their money in May 2022. Despite Plaintiffs' right to withdraw their funds, Defendants have refused to allow Plaintiffs access to their own money.

113.    Defendants' refusal has been made in bad faith.

114.    As a result of Defendants' failure to make available Plaintiffs' funds for withdrawal, Plaintiffs have suffered actual damages of not less than $50,246,815.00, plus interest.

<u>**SIXTEENTH CAUSE OF ACTION**</u>

**Violation of N. M. S. A. § 57-12-3 (by all Plaintiffs against all Defendants)**

115.    Plaintiffs reincorporate and reallege the allegations in paragraphs 1-40 above, as if fully set forth herein.

116.    New Mexico law also provides Plaintiffs a cause of action under § 57-12-10 for violations of its unfair or deceptive trade practices statute, § 57-12-3. Unfair and deceptive trade practices include representing that services have characteristics that they do not; representing that services are of a particular quality or standard if they are of another; "using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive;" "stating that a transaction involves rights, remedies or obligations that it does not involve;" and "failing to deliver the quality or quantity of goods or services contracted for." § 57-12-2(D).

117.    As outlined in paragraph 9 above, Defendants advertised the "Ultra Safety of Customer Deposits" and represented to its clients that customer deposits remain in cash and sovereign bonds. On its website hrbank.com, Defendants advertise that their bank "offers fast, safe…secure" "hassle-free" banking and boasts its "capital strength." These advertisements are false representations of the banking services Defendants offer because Defendants' banking services are anything but safe, fast, or "hassle-free." These representations gave Plaintiffs the erroneous impression that the bank was a safe place to put their money. Based on this erroneous impression, Plaintiffs transferred approximately $50 million to Defendants. Instead of the bank being a safe place for consumer deposits, Defendants bought risky foreign bonds with Plaintiffs' money and have refused to return their funds for over two years.

118.    Defendants represented to Plaintiffs in Texas and/or New Mexico that Plaintiffs' money would be returned to them upon completing identity verification procedures and providing documentation. Defendants made these requests knowing they would not return Plaintiffs' funds even when Plaintiff complied with said requests. Upon Plaintiffs' repeated compliance with Defendants' requests, Defendants in fact failed to return Plaintiffs' funds.

119.    When Intercoastal Finance requested mediation pursuant to Defendants' own policies, Defendants failed to respond to Intercoastal Finance's requests and effectively blocked mediation.

120.    Defendants have effectively stolen Plaintiffs' $50 million and put them through a two-years-long series of documentation requests for the purpose of concealing the fact that they do not have Plaintiffs' funds and never planned on returning Plaintiffs' funds.

121.    Defendants willfully engaged in the aforementioned deceptive trade practice.

122.    As a result of Defendants' false and deceptive representations, Plaintiffs have suffered actual damages of not less than $50,246,815.00, plus interest, and are further entitled to trebling of those damages.

## JURY DEMAND

123.    A jury trial is demanded on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for the following relief:

a.    Repayment of funds deposited by Plaintiffs with Defendants;

b.    An award in an amount to be proven at trial, but not less than $50,246,815.00, including;

    i.    Actual damages;

24

  ii. Consequential damages;

  iii. Punitive damages;

  iv. Trebling of damages pursuant to Tex. Bus. & Com. Code § 17.50(b) and N.M.S.A. § 57-12-10;

  v. Attorneys' fees;

  vi. Pre-judgment and post-judgment interest; and

  vii. Costs and expenses of this action; and

c. Such other and further relief as the Court may deem just and proper.

WHEREFORE, for the reasons set forth herein, plaintiffs very respectfully request this Honorable Court enter judgment against defendants granting the relief requested herein.

In San Juan, Puerto Rico, this 3rd day of October, 2024.

Respectfully submitted,

S/ FRANCISCO E. COLÓN-RAMÍREZ
**FRANCISCO E. COLÓN-RAMÍREZ**
USDC-PR No.: 210510
E-mail: fecolon@colonramirez.com
**COLÓN RAMÍREZ, L.L.C.**
PO Box 361920
San Juan, PR 00936-1920
Tel.: (888) 223-2364

    &

James H. Smith (pro hac admission to be requested)
jsmith@mckooslmith.com

Grant Johnson (pro hac admission to be requested)
gjohnson@mckoolsmith.com

**MCKOOL SMITH, P.C.**
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019
Tel.: (212) 402-9400
Fax: (212) 402-9444